ORR DITCH & WATER COMPANY, Appellant, v. SILVER STATE LODGE, INC., a Corporation, Respondent.

No. 3201

April 4, 1938.                     78 P.(2d) 95.

*George Springmeyer, Sallie R. Springmeyer* and *Bruce R. Thompson,* for Appellant:

*Sidney W. Robinson,* for Respondent.

# OPINION

By the Court, TABER, J.:

This is an appeal from an order of the Second judicial district court, Washoe County, denying a motion for a new trial. Respondent will also be referred to herein as plaintiff; appellant as defendant.

About 3 o'clock on the morning of Monday, April 29, 1935, large quantities of water escaped from a break in the bank of defendant's ditch at a point about 200 yards west of plaintiff's property line, and the water flowed down across intervening property over that of plaintiff. Plaintiff's property consisted of approximately six acres of land adjacent to the Reno-Truckee highway and between the Tavern night club and Crescent Creamery, directly south of defendant's irrigation canal. Plaintiff conducted a hotel business on said property, renting rooms and cabins to tenants.

Before this action was commenced the respective parties signed an arbitration agreement, reading in part as follows:

"Whereas, a controversy is now existing between the Silver State Lodge, Inc., and The Orr Water Ditch Company arising out of damages resulting from the overflow of water from the Orr Ditch onto the lands and premises of the Silver State Lodge, Inc., situate on the Verdi Road just west of the City limits of Reno, Nevada, and,

"Whereas, it is the claim of the Silver State Lodge, Inc., that it has suffered actual damages from the overflow aforesaid as follows: (Items of alleged damage set forth, with amount claimed in each instance.) And the question to be decided is, what is the extent of the

damages to the premises and the property of the Silver State Lodge, Inc., caused by the overflow aforesaid, and what amount shall the Orr Water Ditch Company pay to the Silver State Lodge, Inc., as damages resulting from said overflow?

"Now, therefore, we, the undersigned, Silver State Lodge, Inc., and the Orr Water Ditch Company aforesaid, do hereby submit the said controversy to the arbitrament of Lehman Ferris and Lewis A. Brown, and if they cannot agree to the award, then to Lehman Ferris and Lewis A. Brown and a third arbitrator chosen by the said Lehman Ferris and Lewis A. Brown on or before the 31st day of August, 1935, and the undersigned mutually agree that the award be made by the said arbitrators or any two of them, if a third arbitrator is necessary, shall in all things by the undersigned and each of the undersigned be well and faithfully kept and observed; Provided, however, that the said order be made in writing, by the said arbitrators or any two of them as aforesaid, and ready to be and deliver to the said undersigned parties on the 31st day of August, 1935, and it is hereby stipulated that this arbitration shall be entered as an order of the Second Judicial District Court in and for the County of Washoe."

The date of said arbitration agreement was July 25, 1935, and it was filed in the office of the district court clerk on September 10, 1935.

Plaintiff's action was commenced December 9, 1935. Paragraph IV of the complaint, and the prayer for judgment, read as follows:

"IV. That on or about the 29th day of April, 1935, the retaining side walls of defendant's said ditch broke away by reason of the defective workmanship and improper material used in the construction of the same, and by reason of the negligence of defendant in the maintenance and operation of said ditch, and by reason of the negligence of the defendant in failing to keep said ditch

in a proper state of repair, and by reason of defendant's negligence in turning more water into said ditch than said ditch could carry, thereby causing a large and unusual body of water to discharge itself upon the above described real property of plaintiff, which said water flooded and inundated plaintiff's above described real property and the improvements located thereon, and covered the same with large quantities of rubbish, dirt, debris and slime, all to plaintiff's damage in the sum of One Thousand Eight Hundred and Fifty-six Dollars and Fifty-five Cents ($1,856.55).

"Wherefore, plaintiff prays judgment against defendant for the sum of One Thousand Eight Hundred and Fifty-six Dollars and Fifty-five Cents ($1,856.55) as and for damages sustained by plaintiff as aforesaid, together with its costs of suit incurred herein and for such other and further relief as to the Court may seem just and equitable in the premises."

In its answer defendant denied any negligence; denied that its negligence caused the break in the ditch; denied that plaintiff's damages exceeded $50; and alleged that plaintiff's land was benefited by the silt carried into it by the flood. Plaintiff's reply denied that the damage to its land was not more than $50, and denied that its land was benefited by the silt carried onto it by the flood. After trial before the district court sitting without a jury, judgment for $729.50 damages was awarded plaintiff against defendant. Defendant moved for a new trial, which was denied, and this appeal is from the order denying defendant's motion for a new trial.

The district court's findings of fact contained the following paragraph: "That on or about the 29th day of April, 1935, the retaining side walls of defendant's said ditch broke away by reason of the negligence of defendant in the maintenance and operation of said ditch, and by reason of defendant's negligence in turning more water into said ditch than said ditch could carry,

thereby causing a large and unusual body of water to discharge itself upon the above described real property of plaintiff, which said water flooded and inundated plaintiff's above described real property and the improvements located thereon, and covered the same with large quantities of rubbish, dirt, debris and slime, all to plaintiff's damage in the sum of Seven Hundred and Twenty-nine Dollars and Fifty Cents. ($729.50)."

We shall now briefly state the testimony largely relied upon by respondent in support of the district court's finding that the damage to plaintiff's premises was the result of defendant's negligence.

The break occurred in the south bank of the irrigation canal, frequently referred to in the testimony as the "ditch." James E. Stead, a director of defendant corporation, testified that this bank was covered with willows and sand and rock "and different—just regular earth."

Thomas R. King, a qualified civil engineer called by the plaintiff on rebuttal, being asked on direct examination why water could not run in the ditch bank-full with safety when the banks had willows such as were "near this point at the Orr Ditch," testified: "Because the willows catch the cleanings shoveled from the ditch, they are thrown on to that bank on the lower side for the most part. In throwing those cleanings into those willows, mind you these are small willows, they run seven or eight or ten feet high as a maximum, but the branches are small and not too many of them, although they are hard to walk through, and that silt cleanings deposit are simply as thrown up on the shovel. The bank then takes a slope equal to the nature of angle composed of that material. In other words, it slopes off naturally leaving a narrow top of ground in the willows. Consequently, when your water comes close to the top of your material, seepage immediately occurs, a trickle becomes a hole and you have a break or a weakness. In other words, look at your repair of the break

today. The earth has been placed in there and your bank is ten feet wide at its crest, approximately. Your bank along below and above, built up by years of cleanings is a foot, eighteen inches wide at its crest, slopes off very rapidly, being very, very weak in comparison with the new bank." Mr. King further testified that: "The bank on the lower side there is composed in its top section, we will say· anywhere from six or eight inches to two feet of the cleanings of many years, which is sand and silt removed from the bottom of the ditch each spring, and thrown to the bank. Consequently, it is a· narrow section as it reaches the top composed of that sandy loam, sand and silt and it is apt to leak and be weak." He further testified that the banks "along that section" were sandy—gravelly and sandy loam; and that that type of bank is semipervious, not impervious.

Charles Thompson, manager of the Silver State Lodge, testified that on the three days immediately preceding the break in the irrigation canal, the water, in most places back of plaintiff's place, was several feet from the top. At the place where it broke over, however, "it was right on top of the bank, probably an inch from going over. Up at the Creamery it was flowing over in one place." Mr. Thompson testified, on cross-examination, that between 4 and 5 o'clock on the Sunday immediately preceding the break, he visited the irrigation canal from the old Avansino ranch to where the break occurred in 1934—a distance of approximately 1,400 feet, and that the ditch at that time and place was "completely filled," "running full."

Joseph L. Freitas, employed by the Crescent Creamery where he had been working for some ten years and who lives about 200 feet from the Silver State Lodge, testified, for the plaintiff, that at the request of his children he went to the bank of the ditch and found that it could not carry any more water than was there, as far as he could see.

"Q. How high was the water up to the bank at that

place that you looked at? A. Right in back of the creamery is a place Mr. Chism put a cement wall, I believe was to protect the garage, I am not sure, the water was right in back of that cement wall.

"Q. Was what? A. Was right in back of the cement wall, you can go over there and see that yet still leaking there.

"Q. Was it over the bank? A. Over that cement wall. The bank was a little over a couple of inches from that bank, that cement wall he has got there."

Richard Hugh Cameron, foreman at the Crescent Creamery, testified by deposition that he saw the ditch on the Sunday afternoon immediately preceding the break in the canal early the following morning. The point at which he examined the ditch was right back of the creamery near the waterbox where the creamery gets its water out of the Orr ditch. The ditch was very full, even with the top. He had never seen the ditch any fuller.

Walter L. Bell, who had been assistant to the watermaster of the Truckee river for about ten years, called as a witness in behalf of the defendant, testified on cross-examination that the irrigation canal had carried as high as 92 second-feet of water, and that when carrying that amount of water he would judge that there would not be over a couple of inches of freeboard in some places along the canal. Mr. Bell further testified that the Truckee river was high at the time of the break; it was one of the high points of the year, if not the highest.

Mr. King, a witness hereinbefore mentioned, testified that a minimum freeboard of about 18 inches should be maintained in a ditch having banks of the character of those where the break occurred, in order that the water could be carried with safety.

Plaintiff maintained an automatic spillway in its said irrigation canal. With reference to the operation of this spillway, Mr. Bell, assistant watermaster hereinbefore

mentioned, testified in part, on recross-examination, as follows:

"Q. Well, if the head gate were just arranged so as to permit sufficient water to flow through, or slightly more than the amount that you had allotted, as compared with an open head gate, would the automatic spillway take care of all the excess—let me put the question another way. If the ditch tender with a high river opened the head gate at its full capacity, would the automatic spillway take care of the difference between the full capacity of the ditch above the automatic spillway and the amount that you allotted to the ditch? A. I don't believe that it would take care of it in a case where we were only supposed to have been taking 61 feet through. I think it would safely spill twenty-five or thirty feet, but above that there isn't area enough there for the additional water to get out. Of course, there was no shortage at that time and we was allowed all the water—

"Q. All the water they asked? A. All the water they asked for, and that had been my last request for about sixty feet of water at that time."

In support of its contention that plaintiff failed to meet the burden imposed upon it by law to show that the damage to its property was proximately caused by any negligence on the part of defendant, respondent relies chiefly upon the following:

Defendant's irrigation canal had been thoroughly cleaned about two weeks prior to the day of the break; the cleaning having been completed on April 6, 1935.

Assistant watermaster Bell, some of whose testimony has already been referred to, testified as a witness for defendant, that maximum diversion of water from the Truckee river into the Orr ditch at the diversion point is 100.98 cubic feet per second; that the capacity of the canal is 92 second-feet; and that was the maximum quantity of water carried in the Orr ditch during the six years immediately preceding the trial of this case.

Mr. Bell testified that the quantity of water in the ditch is controlled by an automatic spillway, located, one and one-half miles from the intake; that on April 25, 1935, the gauge in the automatic spillway was set and locked by him to permit 61.1 second-feet of water to flow in the ditch; that the setting of the guage was rechecked on April 26, 1935, and found to be exactly the same; that on April 30, 1935, the day after the break, the lock and gauge and the automatic spillway were examined and found to be in the same conditon as when left by Mr. Bell after he had set them; that the Orr ditch is the only one in the district that has an automatic spillway, and that it has, in addition, a freeboard spillway like the spillways in the other ditches in the district; that the automatic spillway will take care of from 25 to 30 second-feet of water.

"Q. Then, Mr. Bell, as I understand the situation, if you had your automatic spillway set for 61.1 feet of water and the head gates were opened permitting 92 cubic feet to go in, that almost 85 feet would pass east of the automatic spillway down the ditch, is that right? A. No.

"Q. Well, there would be 61.1 plus you say, twenty per cent of the excess, is that right, would go down? A. No, I would not say that. If there is 92 feet in there, there would probably be four or five feet go on, increase in the ditch. The spillway would take care of the rest of it."

Joseph L. Raffetto, ditch superintendent, testified that he went to the spillways and control works about 5 o'clock in the afternoon of the Sunday immediately preceding the break in the canal, to see that everything was in proper shape; also that he was accustomed to go there nearly every day. He further testified that about 5 o'clock on the morning of the break when he was notified that the ditch had broken in Avansino's ranch, he immediately rushed up to the spillway at the water wheel and in going there naturally passed the

automatic spillway; that there were 10 or 15 second-feet of water running over the automatic spillway, and just a little bit, not a great deal, at the flashboard spillway above; that at the point of the break the banks are real high according to the ditch elevations, that is, the height of the water when the ditch is full; that if, on April 28, 1935, and the two preceding days, the water in the vicinity of the Crescent Creamery was nearly to the top of the ditch, the water would be two feet below the crest of the bank at the point of the break; that there were a "thousand" places in the ditch where the bank was lower than at the point of the break, but there were no other overflows at any other part of the ditch on April 28, 1935.

James E. Stead, some of whose testimony in behalf of plaintiff has heretofore been referred to, was also called as a witness by the defendant, and testified in part that he went up to Avansino's about 4 o'clock in the afternoon of Saturday, April 27, 1935, and that the ditch at that place, in his estimation, was about two-thirds full, or a little less.

Assistant watermaster Bell testified that in the year 1935 some one cut a small trench in the top of the bank of the Orr ditch near the University of Nevada, resulting in the flooding of the ground around a tennis court.

No witness testified to having been present at the time of the break.

The arbitration agreement of July 25, 1935, was admitted in evidence over the objection of defendant that it was in the nature of a compromise, and so inadmissible.

Plaintiff was permitted, over the objection of defendant, to testify to loss of business because of some guests moving out and other guests having to be turned away. Defendant's objection to this line of testimony was that it was not within the issues presented by the pleadings, as the items constituted special damages, and no special

damages were pleaded. In its judgment the district court allowed $30 for said loss of business.

The assignments of error chiefly relied upon by appellant are: (1) That the evidence does not establish negligence in the construction, operation, or maintenance of the ditch; (2) that the evidence does not establish causal connection, in that it does not show that the water escaped because defendant turned too much water in the ditch or because the ditch bank was defective, or because of any other act or omission of the defendant; (3) that the trial court erred in admitting the arbitration agreement in evidence as an admission of liability by the defendant; (4) that the trial court erred in admitting evidence of loss of guests and of loss of prospective business as damages.

Appellant contends that the evidence was insufficient to justify any finding of the district court that defendant was negligent in the maintenance or operation of its ditch, or in turning more water into said ditch than it could carry; or a finding that any negligence of the defendant was the cause of the break in the ditch bank and the resulting flooding of plaintiff's property. This is particularly true, according to appellant, because plaintiff was not content in its complaint to rely upon a general allegation of negligence, but set out specifically the negligent acts or omissions complained of, and so was not entitled to the benefit of the doctrine of res ipsa loquitur. Austin v. Dilday, 55, Nev. 357, at page 362, 34 P.(2d) 1073, 36 P.(2d) 359. Respondent's position is that regardless of the doctrine of res ipsa loquitur, the evidence was amply sufficient to justify the district court's findings that defendant was negligent and that its negligence was the proximate cause of the injuries to plaintiff's property.

If we were to consider only the testimony and evidence adduced in behalf of defendant, there would be some basis for appellant's contention. But when we consider all the evidence relating to the condition

of the south bank of the ditch at the point where the break occurred, the materials of which it was constructed, the positive testimony of plaintiff's witnesses as to the amount of water running in the ditch at this point immediately before the break, and the testimony of the civil engineer that the ditch at said point could not be safely operated with a freeboard of less than about 18 inches, it seems clear to us that the trial court, without regard to the doctrine of res ipsa loquitur, could reasonably conclude that defendant was negligent and that its negligence was the proximate cause of the injuries to the plaintiff's premises. Where, as here, there is a substantial conflict of evidence on the material issue of fact, this court will not order a reversal unless it is clear that a wrong conclusion was reached.

There was no error in admitting in evidence the arbitration agreement hereinbefore mentioned. There was no denial in this agreement, either express or implied, of liability on the part of defendant, and the only matters to be arbitrated were the extent of the damage and the amount to be paid by defendant. Plummer v. Currier, 52 N. H. 287; Kahn v. Traders' Ins. Co., 4 Wyo. 419, 34 P. 1059, at page 1076, 62 Am. St. Rep. 47; Tompkins, Trial Evidence, The Chamberlayne Handbook 1936, sec. 651, pp. 625, 626, notes 20, 21, 24; 22 C. J. 313, notes 10, 11, 17, 18. It may further be observed that in the arbitration agreement both parties expressly agree that the award to be made by the arbitrators shall in all things be by them and each of them well and faithfully kept and observed. This provision, when considered in connection with the fact that the question of defendant's liability is not referred to in any way in said agreement, entitles it to be admitted in evidence without violating the general rule that offers of compromise are not admissible as admissions of liability.

We think it was error for the trial court to admit testimony showing loss of business occasioned

by the fact that some of plaintiff's guests gave up their rooms or cabins, and the further fact that plaintiff was compelled to turn away other persons who desired to rent rooms or cabins. Not only does the prayer of the complaint fail to specially pray damages for the loss of such business, but the complaint contains no allegations that guests gave up their rooms or cabins or that plaintiff was compelled to turn away other customers. The allegation in the complaint that the escaped water flooded plaintiff's land and improvements, and covered them with rubbish, dirt, debris, and slime, all to plaintiff's damage in a certain sum, does not, in our opinion, fairly notify defendant that any claim will be made for loss of business owing to guests vacating their rooms or other customers having to be turned away. Such loss of business should have been specially alleged.

■ If respondent, within fifteen days after notice of this decision, shall file a remittitur in the sum of $30, thus reducing the amount of its judgment from $729.50 to $699.50, the order denying a new trial will stand affirmed; otherwise, said order denying a new trial will be reversed and a new trial awarded appellant.

Costs on appeal will be paid as follows: Two-thirds by appellant; one-third by respondent.